IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

AUG – 5 2008

U.S. ...
A.L.E.X...

Calvin Jermaine Vines,  )
    Petitioner,  )
           )
v.  )        1:07cv1224 (LMB/JFA)
           )
Gene Johnson,  )
    Respondent.  )

MEMORANDUM OPINION

Calvin Jermaine Vines, a Virginia inmate proceeding pro se, filed this petition for a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the validity of his conviction in the Circuit

Court for the City of Norfolk, Virginia for robbery, conspiracy to commit a felony, use of a firearm

during the commission of a felony and grand larceny. On April 2, 2008, respondent filed a Rule 5

Answer, Motion to Dismiss the petition, memorandum of law in support of that Motion, and Notice,

pursuant to Local Civil Rule 7(K). Vines was given the opportunity to file responsive materials,

pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and he has filed a response. For the

reasons that follow, the petition will be dismissed.

I.

On June 14, 2004, after his motion to suppress the statements he gave to police had been

denied, Vines entered a conditional plea in the Circuit Court for the City of Norfolk, Virginia to two

counts of robbery, two counts of conspiracy to commit a felony, one count of use of a firearm in the

commission of a felony, and one count of grand larceny.[1] Sentencing Order dated Nov. 18, 2004;

---

[1] On April 14, 2003, the trial court began taking evidence in a suppression hearing regarding the statements Vines had made to police following a stop of the vehicle in which he was a passenger. At the conclusion of that hearing, Vines' motion to suppress was denied, Tr. dated Apr. 14, 2003, Vol. 2 at 100, but the trial court vacated its ruling to allow Vines the opportunity to testify. See id.

see Pet at 1. During his plea colloquy with the trial court, Vines acknowledged: (1) that the decision to plead guilty was his own, (2) that he had discussed with his counsel whether to plead guilty, (3) that he had waived his rights to trial, and (4) that he was entering the guilty please because he was in fact guilty of these offenses. Tr. dated June 14, 2004 at 6-9. The trial court found that Vines' pleas were freely, voluntarily, and intelligently made, accepted the pleas and found Vines guilty of these offenses. Id. at 13, 15.

A sentencing hearing was held on November 5, 2004. At that hearing, the Commonwealth's Attorney revealed that one of the victims in this case, a Mr. Garthea Brown, could not be contacted for a victim impact statement for Vines' pre-sentence report because Brown was deceased, having been shot to death "several months ago." Tr. dated Nov. 5, 2004 at 7. Vines was sentenced at that hearing to 51 years imprisonment with 28 years suspended. Id. at 37; Sentencing Order at 2. Vines appealed his conviction to the Court of Appeals of Virginia, arguing that the trial court erred in denying his motion to suppress the statements he gave to police. Pet. for Appeal dated Mar. 8, 2005 at 10. Specifically, he argued that: 1) the police were not justified in stopping the vehicle in which he was a passenger and taking him into custody and 2) that his subsequent statements to the police were not knowingly, intelligently and voluntarily made. On June 30, 2005, the Court of Appeals of Virginia denied the petition for appeal. Vines v. Commonwealth, R. No. 2691-04-1, slip op. (Va. Ct. App. June 30, 2005). Petitioner sought review by a three-judge panel of that court, and by order

at 104, 109. The trial court then set the motion to be reheard in front of another trial judge. Id. at 110. The transcript from the first suppression hearing was admitted into evidence at the second hearing, and after Vines and a detective presented live testimony, the trial court denied the motion to suppress on Dec. 3, 2003. Tr. dated Dec. 3, 2003 at 92. Vines entered his guilty plea on June 14, 2003. Tr. dated June 14, 2004 at 11. According to the plea agreement, the entry of the plea was conditional, allowing Vines to preserve his right to appeal the ruling on the suppression issue. Id.

dated September 8, 2005, his request was denied. Vines v. Commonwealth, R. No. 2691-04-1, order (Va. Ct. App. Sept. 8, 2005). Vines then appealed to the Supreme Court of Virginia, again challenging the trial court's decision to deny the motion to suppress the statements he gave to police. The Supreme Court of Virginia refused the petition for appeal on December 22, 2005. Vines v. Commonwealth, R. No. 051938, slip order (Va. Dec. 22, 2005).

Vines filed a petition for a writ of habeas corpus in the Circuit Court for the City of Norfolk on December 18, 2006. Pet. at 3. That petition raised four claims. Vines alleged that: 1) in violation his right to due process under Brady v. Maryland, 371 U.S. 812 (1962), the Commonwealth failed to disclose the death of victim Garthea Brown; 2) trial counsel was ineffective in failing to request from the fact that Garthea Brown had died, information Vines claimed was material to his defense and known by the Commonwealth's attorney; 3) the trial court erred in denying the motion to suppress the statements given to police because the police were not justified in stopping the vehicle in which he was a passenger and taking him into custody and his subsequent statements to the police were not knowingly, intelligently and voluntarily made; and 4) his guilty plea was not voluntarily and intelligently made because counsel failed to advise him of what the prosecution had to prove in order to find him guilty beyond a reasonable doubt and because he was not aware of the evidence regarding the death of Garthea Brown, evidence of which he claimed had he been aware, he would not have pled guilty. Pet. dated Dec. 18, 2006. On January 25, 2007, the Circuit Court for the City of Norfolk dismissed the petition. Vines v. Johnson, File No. L-06-6706, order (Cir. Ct. Jan. 25, 2007). Vines appealed the circuit court's order dismissal to the Supreme Court of Virginia, raising the same four claims. Pet. for Appeal dated Apr. 24, 2007. By Order dated August 27, 2007, the Supreme Court of Virginia refused the petition for appeal. Vines v. Johnson, R. No. 070832, slip

order (Va. Aug. 27, 2007). Vines filed the instant federal petition on November 20, 2007. He raises the same four claims in the instant petition that he presented to the Circuit Court for the City of Norfolk and the Supreme Court of Virginia on state habeas.

## II.

A federal court reviewing a habeas petition under 28 U.S.C. § 2254 must determine whether any of the claims are barred from review as a result of the petitioner's procedural default. Respondent correctly argues that claim 1 is procedurally defaulted and, therefore, barred from this Court's review.

The principles governing procedurally defaulted claims are well-established. In Virginia, any objection not contemporaneously made when an error is committed cannot be asserted on appeal, unless petitioner shows good cause. Conquest v. Mitchell, 618 F.2d 1053 (4th Cir. 1980). Under Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974), state habeas review of a claim is barred by failure to raise that claim at trial and on direct appeal. A state court's finding of procedural default is entitled to a presumption of correctness, Clanton v. Muncy, 845 F.2d 1238, 1241 (4th Cir. 1988) (citing 28 U.S.C. § 2254(d)), provided two foundational requirements are met. Harris v. Reed, 489 U.S. 255, 262-63 (1989). First, the state court must explicitly rely on the procedural ground to deny the petitioner relief. Ylst v. Nunnemaker, 501 U.S. 797 (1991); Harris, 489 U.S. at 259. Second, the state procedural rule that serves to default the petitioner's claim must be an independent and adequate state ground for denying relief. Harris, 489 U.S. at 260; Ford v. Georgia, 498 U.S. 411, 423-24 (1991). In this circuit, it is settled that the procedural default rule set forth in Slayton qualifies as an independent and adequate state ground. Mu'min v. Pruett, 125 F.3d 192, 196 (4th Cir. 1997). Thus, where a state court denies relief, explicitly relying on a procedural default pursuant

4

to <u>Slayton</u>, a reviewing federal court may not consider such claim on the merits, <u>Mackall v. Angelone</u>, 131 F.3d 442, 446 (4th Cir. 1997), absent a showing of cause and prejudice or actual innocence, the only miscarriage of justice recognized as sufficient to excuse procedural default. <u>See</u> <u>Roach v. Angelone</u>, 176 F.3d 210, 221 (4th Cir. 1999). The existence of cause ordinarily turns upon a showing of: 1) a denial of effective assistance of counsel, 2) a factor external to the defense which impeded compliance with the state procedural rule, or 3) the novelty of the claim. <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). To avail himself of the actual innocence claim as a procedural gateway to assert an otherwise defaulted claim, a petitioner "must offer 'new reliable evidence ... that was not presented at trial,' "and" 'the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" <u>Royal v. Taylor</u>, 188 F.3d 239, 244 (4th Cir. 1999) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)).

In this case, the Circuit Court for the City of Norfolk refused to grant relief with respect to claim 1, holding that Vines had knowledge of Brown's death prior to the trial court's imposition of the sentence and could have raised a claim that the Commonwealth's attorney's failure to disclose this information constituted a <u>Brady</u> violation sufficient to invalidate his guilty plea but failed to do so. <u>Vines</u>, File No. L. 06-6705, slip op. at 4. Accordingly, the court held that this claim was procedurally defaulted, pursuant to the rule announced in <u>Slayton</u>. <u>Id.</u>[2] The Supreme Court of Virginia refused Vines' petition for appeal on state habeas without explanation. In this circumstance it is appropriate for this Court to infer that the Supreme Court of Virginia's ruling was based on the same reasoning

---

[2] Alternatively, the court rejected Vines' <u>Brady</u> claim on its merits, finding that Vines did not establish that information relating to the death of Garthea Brown was favorable to his defense, either because the information was exculpatory or had some impeaching value; that the prosecution suppressed the information; and that prejudice resulted from the suppression. <u>See Vines</u>, File No. L. 06-6705, slip op. at 4-10 (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).

as the Circuit Court for the City of Norfolk. See Ylst, 501 U.S. at 803.

Because both foundational requirements have been meet with respect to claim 1, this Court is barred reviewing it absent a showing of cause or prejudice or a fundamental miscarriage of justice. Vines does not proffer evidence sufficient to establish his innocence under Schlup v. Delo. Instead, he alleges that his procedural default of claim 1 should be excused because his trial counsel rendered ineffective assistance. Specifically, Vines claims, as he did in a secondary argument on state habeas, that counsel was ineffective for advising him that the prosecutor's sentencing-day revelation concerning Garthea Brown did not matter and in failing to raise a Brady objection prior to the imposition of sentence. However, as explained infra in Part IV, counsel did not render ineffective assistance in this case. Thus, Vines has failed to demonstrate cause to excuse his procedural default, and claim 1 will be dismissed. See Clozza, 913 F.2d at 1014 (finding that a meritless ineffective assistance of counsel claim cannot excuse a procedural default).

## III.

When a state court has addressed the merits of a claim raised in a federal habeas petition, a federal court may not grant the petition based on the claim unless the state court's adjudications are contrary to, or an unreasonable application of, clearly established federal law, or are based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The evaluation of whether a state court decision is "contrary to" or "an unreasonable application of" federal law is based on an independent review of each standard. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court determination runs a foul of the "contrary to" standard if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable

facts." <u>Williams</u>, 529 U.S. at 413.  Under the "unreasonable application" clause, the writ should be granted if the federal court finds that the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>  Importantly, this standard of reasonableness is an objective one.  <u>Id.</u> at 410. Moreover, in evaluating whether a state court's determination of the facts is unreasonable, a federal court reviewing a habeas petition "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)); <u>see</u>, <u>e.g.</u>, <u>Lenz v. Washington</u>, 444 F.3d 295, 300-01 (4th Cir. 2006).

## IV.

Where, as here, a petitioner seeks habeas corpus review of his conviction pursuant to a guilty plea, a reviewing federal court must first determine whether the petitioner's constitutional challenge is foreclosed by that guilty plea.  It is well-settled that a voluntary and intelligent guilty plea generally forecloses federal collateral review of allegations of antecedent constitutional deprivations.  <u>Tollett v. Henderson</u>, 411 U.S. 258, 266-67 (1973); <u>Fields v. Attorney Gen. of Md.</u>, 956 F.2d 1290, 1294 (4th Cir. 1992).  This is because a guilty plea removes the issue of factual guilt from the case and "renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction." <u>Menna v. New York</u>, 423 U.S. 61, 63 n.2 (1975).  Accordingly, once judgment on a plea is final, collateral inquiry for constitutional claims that occurred prior to its entry is generally limited to whether the plea itself was knowing and voluntary.  <u>Slavek v. Hinkle</u>, 359 F.Supp.2d 473, 481 (E.D.Va. 2005).  Thus, guilty pleas do not preclude review of ineffective assistance of counsel claims because the voluntariness of a plea can

depend on the effectiveness of counsel's assistance. Id. at 491. Moreover, federal collateral inquiry for constitutional claims is permitted in those instances "when state law permits a defendant to plead guilty without forfeiting his review to specified constitutional issues," for example, by entry of a conditional guilty plea. Id. at 482 (citing Lefkowitz v. Newsome, 420 U.S. 283, 293 (1975); Fields, 956 F.2d at 1295). Claims 2 and 4 challenge the effectiveness of trial counsel's assistance. Because the effectiveness of counsel's assistance in this case may bear on the voluntariness of Vines' guilty plea, claims 2 and 4 are not foreclosed by that plea. Claim 3 challenges the trial court's ruling on the suppression of Vines' statements to police, and was explicitly preserved as part of Vines' entry of the conditional guilty plea. As such, this Court's consideration of claim 3 is not barred by the entry of that plea.

A. Ineffective Assistance of Counsel

To succeed on his claims of ineffective assistance of counsel, Vines must demonstrate that (1) "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the range of professionally competent assistance," Strickland v. Washington, 466 U.S. 668, 690 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "The petitioner must show both deficient performance and prejudice; the two are separate and distinct elements of an ineffective assistance claim." Spencer v. Murray, 18 F.3d 229, 232-33 (4th Cir. 1994).

With respect to the first prong of the Strickland test, "[j]udicial scrutiny of counsel's performance must be highly deferential," Strickland, 466 U.S. at 689, and the court must "presume that challenged acts are likely the result of sound trial strategy." Spencer, 18 F.3d at 233. With respect to the second prong of the Strickland test, "a reasonable probability is a probability sufficient

to undermine confidence in the outcome." 466 U.S. at 694. In order to undermine confidence in the trial outcome, petitioner must show more than a remote possibility that the results of the trial would have been different. Washington v. Murray, 4 F.3d 1285, 1290 (4th Cir. 1993).

When considering an ineffective assistance of counsel claim in the context of a guilty plea, federal courts must apply a modified version of the two-part "performance and prejudice" test articulated in Strickland. See Hill v. Lockhart, 474 U.S. 52, 59 (1985); Burket v. Angelone, 208 F.3d 172, 194 (4th Cir. 2000). Specifically, the modified two-step analysis requires a petitioner (i) to "demonstrate that his trial counsel's performance fell below an objective standard of reasonableness," and (ii) to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Burket, 208 F.3d at 194 (quoting Hill, 474 U.S. at 59). A successful petition "must show both deficient performance and prejudice," and "the two are separate and distinct elements of an ineffective assistance claim." Spencer v. Murray, 18 F.3d 229, 232-33 (4th Cir. 1994).

In claim 2, Vines asserts that counsel was ineffective because she did not find out about Garthea Brown's death, information Vines asserts was known to the Commonwealth's attorney and material to his defense, and was thus unable to subject the Commonwealth's case to meaningful adversarial testing. He also claims that counsel was ineffective for failing to raise a claim that the prosecutor's sentencing-day revelation of Brown's death constituted a Brady violation sufficient to invalidate Vines' guilty plea. In claim 4, Vines asserts that his guilty plea was not voluntarily and intelligently made as the result of counsel's ineffective assistance. Specifically, he claims that a) counsel failed to advise him of what the Commonwealth had to prove in order to find him guilty beyond a reasonable doubt and that b) had he known of the information regarding Garthea Brown's

9

death, information he claims counsel was ineffective in failing to uncover, he would not have pled guilty.

The Circuit Court for the City of Norfolk addressed these claims in its review of Vines' state habeas petition and determined that Vines' trial counsel had not rendered ineffective assistance. Vines v. Johnson, File No. L-06-6705, slip op. at 10, 12-13, 15-16, 19-21. As to claim 2, the circuit court found that Vines' counsel "actively protect[ed]" Vines discovery rights by filing discovery motions on Vines' behalf. Id. at 13. Noting that a Brady violation does not look to the performance of defense counsel, but the acts or omissions of the prosecution, the circuit court held that any withholding of eligible Brady evidence resulted from the error of the prosecution, not the error of defense counsel. Id. As to claim 4, the circuit court found that Vines asserted to the trial court during his plea colloquy that he had discussed with counsel the Commonwealth's case against him, that he was satisfied with the services of his attorney, and that he admitted his guilt to the crimes to which he pled, including those against Garthea Brown while Brown was still alive. Id. at 20-21. Although the circuit court did not directly address Vines' sub-claim that counsel was ineffective for failing to raise an objection at sentencing that the Commonwealth's revelation concerning Garthea Brown's death violated Vines' rights under Brady, it did hold that Vines failed to show the existence of a Brady violation. Citing to the Supreme Court's decision in Strickler v. Greene, 527 U.S. 263, 281-82 (1999), the circuit court held that Vines had failed to show that the evidence concerning Brown's death was favorable to his defense, was suppressed by the Commonwealth either inadvertently or willfully, and that prejudice resulted from the suppression. Id. at 4-5. As noted, the Supreme Court of Virginia dismissed Vines' petition for appeal on state habeas without explanation. Accordingly, it is appropriate for this Court to infer that the Supreme Court of Virginia's ruling was

10

based on the same reasoning as the Circuit Court for the City of Norfolk. See Ylst, 501 U.S. at 803.

The state court's rulings with respect to claims 2 and 4 were not unreasonable. As to claim 2, counsel was not ineffective for failing to uncover Garthea Brown's death. As an initial matter, nothing in the record speaks to the date of Brown's death; it reveals only that the Commonwealth's Attorney disclosed Brown's death at sentencing and that the Commonwealth's attorney knew that Brown could not be contacted for a victim impact statement for the pre-sentence report because he had been shot "several months earlier." Nearly five months elapsed between the date on which Vines pled guilty and the date of sentencing; however, the record does not support the contention, and petitioner certainly does not claim, that Brown's death occurred at a point in time prior to Vines' decision to plead guilty. Therefore, counsel simply could not render deficient performance in failing to find out about a death that had not yet occurred prior to Vines' decision to take a guilty plea. However, even if the Court were to assume that the Commonwealth's Attorney had knowledge of Brown's death and failed to disclose that knowledge to Vines prior to his plea,[3] there is simply no plausible suggestion from Vines as to how his trial counsel's performance could fall below an objective standard of reasonableness in failing find out about a death of which the Commonwealth's attorney alone had knowledge but failed to disclose. The circuit court's reasoning on this matter is clearly correct - if the Commonwealth's attorney withheld evidence concerning the death of Garthea Brown, it is the Commonwealth's attorney that bears responsibility for that error, not Vines' trial counsel. Vines' suggestion in his memoranda that trial counsel's ineffectiveness somehow led to or resulted in the Commonwealth's attorney not disclosing Brown's death until sentencing is wholly conclusory and finds no support from the record. Finally, as to Vines' sub-claim that counsel was

---

[3] The Court does not purport to make a finding to this effect.

ineffective for failing to object on <u>Brady</u> grounds to the Commonwealth's attorney's sentencing-day revelation concerning Brown's death, Vines has failed to show that counsel's performance was deficient.  As the state habeas court correctly noted, Vines must make a three-part showing to establish the existence of a <u>Brady</u> violation for undisclosed evidence: (1) the evidence at issue is favorable to the accused either because it is exculpatory or impeaching; (2) the evidence was suppressed by the government, either willfully or inadvertently; and (3) resulting prejudice.  <u>See</u> <u>Vines</u>, File No. L. 06-6705 (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).  The state habeas court found, however, that Vines failed to make this showing.  The record supports this determination.  As noted, there is simply nothing in the record to suggest that the Commonwealth or its attorney in any way suppressed the fact of Garthea Brown's death or otherwise prevented that information from reaching Vines and defense counsel in a timely manner, and Vines does not show otherwise in this proceeding.  Accordingly, in failing to raise a meritless <u>Brady</u> objection at sentencing, counsel's performance did not fall below an objective standard of reasonableness.  Because petitioner has failed to show counsel rendered ineffective assistance with respect to the acts or omissions described in claim 2, the Court cannot conclude that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Therefore, claim 2 will be dismissed.

Claim 4 likewise fails, as Vines has failed to show either deficient performance or prejudice. Vines' claim that his guilty plea was not voluntarily made because counsel failed to advise him of the elements of the offenses of which he was charged is belied by the record. Vines admitted under oath at the plea colloquy that he had discussed with his trial counsel the Commonwealth's case against him and that he was satisfied with counsel's performance. Moreover, even assuming an error on counsel's

12

part in failing to so advise, Vines has failed to establish resulting prejudice. Finally, for the reasons stated above, Vines' assertion that his guilty plea was involuntary because counsel was ineffective for failing to uncover the death of Garthea Brown is utterly without merit. Because Vines has failed to show that counsel rendered ineffective assistance, the state court's disposition with respect to claim 4 was neither contrary to, nor an unreasonable application of, clearly established federal law. Therefore, claim 4 will be dismissed.

### B. Motion to Suppress Statements

Claim 3 challenges the trial court's denial of Vines' motion to suppress statements given to the police. Specifically, Vines claims that a) the police were not justified in stopping the vehicle in which he was a passenger and taking him into custody and b) his subsequent statements to the police were not knowingly, intelligently and voluntarily made. The Court addresses each sub-claim in turn.

### 3(a) Stop and Custody

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures [.]" U.S. Const. amend. IV. The "touchstone" of the Fourth Amendment is reasonableness, United States v. Knights, 534 U.S. 112, 118 (2001). It does not bar all searches and seizures, but only those that are "unreasonable," United States v. Reid, 929 F.2d 990, 992 (4th Cir. 1991). It is also well-settled that a search conducted without a warrant is per se unreasonable unless it falls within one of the "well-delineated exceptions" to the warrant requirement. Katz v. United States, 389 U.S. 347, 357 (1967). One such exception is the authority of police officers to effect a limited detention when they possess a "reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). Traffic stops, like arrests, are detentions implicating the Fourth Amendment.

Delaware v. Prouse, 440 U.S. 648, 653 (1979);  United States v. Foreman, 369 F.3d 776 (4th Cir. 2004).  A traffic stop is constitutionally reasonable when a police officer has  "probable cause to believe that a traffic violation has occurred[,]" Whren v. United States, 517 U.S. 806, 810 (1996), or when the officer has a reasonable suspicion supported by articulable facts that "criminal activity may be afoot," United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968).  A reasonable, articulable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 699 (1996) (internal quotation marks omitted).   In evaluating whether a traffic stop is supported by reasonable suspicion, a court is to took to the circumstances known to the officers at the time of the stop as well as "the specific reasonable inferences which [they are] entitled to draw from the facts in light of [their] experience." United States v. Smith, 396 F.3d 579, 583 (4th Cir. 2005) (quoting Terry, 392 U.S. at 27).  The subjective intentions and motivations of the police officer are not relevant to the Fourth Amendment analysis, see Whren, 517 U.S. at 813, which is satisfied by the existence of an objective basis for the stop.

Involuntary transport to a police station for questioning, however, requires either judicial authorization or probable cause and will not be justified on a basis less than probable cause.  Kaupp v. Texas, 538 U.S. 626, 630 (2003) (holding that the "involuntary transport to a police station for questioning is sufficiently like an arrest[t] to invoke the traditional rule that arrests may constitutionally made only on probable cause.") (internal quotation marks omitted); see Dunaway v. New York, 442 U.S. 200, 207-09 (1979).  Probable cause is determined from the totality of circumstances known to the officer at the time of the arrest, Illinois v. Gates, 462 U.S. 213, 230-31 (1983); United States v. Garcia, 848 F.2d 59-60 (4th Cir. 1988), and it exists where there is enough

14

evidence to warrant the belief by a reasonable officer than an offense has been or is being committed, Wong Sun v. United States, 371 U.S. 471, 479 (1963). The probable cause determination turns on two factors: 1) the suspect's conduct as known to the officer and 2) the contours of the offense thought to be committed by that conduct. Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992).

The Court of Appeals of Virginia summarized the evidence relating to the stop of the car in which petitioner was a passenger and petitioner's subsequent placement in custody as follows:

> [T]he evidence proved that Norfolk Police Detective ... Donnelly investigated several robberies allegedly perpetrated by [petitioner] and Charles Walton, including a November 2, 2002 robbery of a Bank of America. Donnelly had received information that the suspect in that robbery, a black male with long dreadlocks, presented a note to the teller requesting money and told her that if she didn't comply, he would blow her head off. Donnelly also received information that the vehicle used in that robbery was a red Mustang, with a black convertible top, and that there was another black male in that vehicle. Donnelly was also aware that law enforcement personnel in Chesapeake and Virginia Beach were investigating robberies in those jurisdictions involving a similar suspect and vehicle.

> On December 4, 2002, Donnelly received a telephone call from a police officer stationed at the Bank of Hampton Roads. That police officer told Donnelly that a teller had advised him that the bank was about to be robbed. The police officer's description of the suspect matched the description of the suspect involved in the November 2, 2002 Bank of America robbery. Donnelly told the police officer to close the bank and that he would be right there. When Donnelly arrived at the Bank of Hampton Roads, he viewed a surveillance videotape of the suspect. The suspect depicted on the videotape matched the suspect depicted in surveillance camera photographs that Donnelly had obtained from the Bank of America robbery. Donnelly also learned that the suspect left the Bank of Hampton Roads in a red Mustang convertible, with another black male.

> Donnelly immediately put out on all radio channels a description of the suspect and the vehicle and the direction in which it had headed. Within one and one-half minutes, an undercover narcotic unit saw the red Mustang vehicle and radioed Donnelly. The undercover narcotic unit proceeded to follow the Mustang into Chesapeake, where Chesapeake Police Officer ... Boyce ultimately initiated a traffic stop of the Mustang. Boyce testified that he stopped the Mustang when he saw it after receiving a "BOL for a red Mustang with a black top with two black males inside, the passenger wearing dreads, the driver being a heavier set black male." Boyce had also received the Virginia license number from the police dispatcher.

Within a few minutes Norfolk Police Detectives ... McMorris and ... Garrison responded to the scene of the stop. McMorris, who was investigating an October 10, 2002 robbery of a Motel 6 ..., radioed to Donnelly that Garrison said they had a suspect that matched the suspect in the videotapes of the prior bank robberies and a vehicle that matched the suspect's vehicle.

McMorris testified that he responded to the scene of the stop because [petitioner's] description matched the description of the person who robbed the Motel 6. When McMorris arrived at the scene, [petitioner] was alone in a marked police unit. McMorris viewed [petitioner], whose appearance matched the description of the Motel 6 robbery suspect, a black male with very heavy, long dreadlocks. [Petitioner] was taken into custody ... and transported to the Norfolk Police Operations Center (POC) ....

...

[Petitioner] testified that on December 4, 2002, he and Walton drove to the Bank of Hampton Roads. [Petitioner] claimed that while he was inside the bank, he talked to a woman about a date and talked to a female bank manager about interest rates, and then he and Walton left. When they were subsequently stopped by the Chesapeake police, Walton was the driver of the red Mustang and [petitioner] was a passenger. [Petitioner] testified that when they were stopped, the police officer told Walton that he was speeding and requested to see his driver's license ....[S]everal unmarked Norfolk police cars [then] pulled up near the Mustang, and ... officers drew their guns on [petitioner] and Walton. [Petitioner] claimed that those officers ordered Walton and [petitioner] to exit the vehicle with their hands up. [Petitioner] complied. He claimed that the police told him that "Norfolk wanted [him]," but [t]hey never told [him] why." [Petitioner] stated that he gave the police his identification, which the police ran, and it came back as "no warrants" .... [A]fter ten to twenty minutes, the Norfolk police transported him to the POC.

...

On cross-examination, [petitioner] admitted that when he entered the Bank of Hampton on December 4, 2002, he wore his hair in dreadlocks, which came down to his collarbone.

Vines, R. No. 2691-04-1, slip op. at 2-3, 5, 6.  Rejecting petitioner's challenge to the police's decision to stop the vehicle and take him into custody, the Court of Appeals of Virginia stated:

In denying [petitioner's] motion to suppress his statements, the trial court found that police officers were justified in stopping the vehicle in which [petitioner] was a passenger and in taking [petitioner] into custody.

16

...

> [W]e find no Fourth Amendment infirmities in the investigatory detention of [petitioner] or his subsequent arrest. Boyce made the traffic stop based on the BOL dispatch for a vehicle, license plate number, and suspects matching those he saw, which were believed to have just been involved in a robbery attempt at the Bank of Hampton Roads. The duration of the detention was reasonable under the circumstances. After the other officers arrived at the scene within minutes and saw that [petitioner] and Walton matched robbery suspects depicted in surveillance camera photographs from other robberies, the officers had ample reason to believe that [petitioner] had committed the robbery. Thus, reasonable suspicion ripened into probable caus, warranting both [petitioner's] detention and ultimate arrest.

Vines, R. No. 2691-04-1, slip op. at 7. The reasoning of the Court of Appeals of Virginia is imputed to the Supreme Court of Virginia, which refused the petition for appeal without explanation. See Ylst, 501 U.S. at 803.

Several factors justified the initial stop of the vehicle in which petitioner was a passenger. Officer Donnelly had knowledge that a suspect with physical characteristics matching those of petitioner was involved in two bank robberies and that, in each instance, he left the bank in a red Mustang vehicle with another male. Donnelly relayed his description of the suspect and the vehicle to the police radio channels. Boyce initiated a traffic stop of the vehicle based on his observation of a Mustang with a passenger, driver and license plate matching those described in the police dispatch. This combination of factors more than met the threshold objective test of a reasonable and articulable suspicion and justified Boyce's stop of the Mustang vehicle. Petitioner's placement in custody following the traffic stop was likewise justified as the totality of the circumstances would warrant the belief by reasonable officers that petitioner was involved in the bank and motel robberies. Officer Boyce observed that the Mustang contained two individuals matching the description of persons involved in the bank robberies. Moreover, officer Garrison observed that

petitioner matched the description of an individual involved in the recent robbery of a motel. The officers in this case had ample reason to believe that petitioner had committed robbery. As such, they were justified in stopping the Mustang vehicle and effecting petitioner's arrest. The Supreme Court of Virginia's decision with respect to claim 3(a) was neither contrary to, nor based on an unreasonable application of, clearly established federal law, nor was it based upon an unreasoanble determination of the facts. As such, claim 3(a) will be dismissed.

### 3(b) Statements to Police

In claim 3(b), petitioner asserts that his post-arrest statements to police were not knowingly, intelligently and voluntarily made. As such, petitioner asserts that the trial court erred in admitting those statements into evidence.

It is well-settled that any statements or confessions made during a custodial police interrogation must be suppressed unless the person subject to the interrogation, prior to making his statements, was properly informed of his right to remain silent and right to an attorney and made a knowing, intelligent and voluntary waiver of these rights. Miranda v. Arizona, 384 U.S. 436 (1966). Miranda and its progeny make clear that this principle applies only when a criminal suspect is "in custody" or "otherwise deprived of [his] freedom of action in any significant way." Id. at 444; see United States v. Photogrammetric Data Servs., Inc., 259 F.3d 229, 240 (4th Cir. 2001). A suspect is "in custody" for Miranda purposes when, taking into account the "totality of the circumstances," the suspect's freedom of action is "curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (citations omitted). Supreme Court authority also makes clear that statements made during a custodial interrogation must be suppressed unless the suspect's wavier of his Miranda rights is knowing and voluntary. Patterson v. Illinois, 487 U.S. 285, 292 (1988);

North Carolina v. Butler, 441 U.S. 369, 373 (1979).  For a waiver to be considered valid under this standard, the suspect mut be adequately apprised of and understand his Miranda rights and the consequences of waiving those rights and must not be threatened, forced, or coerced in any way.  See United States v. Nguyen, 313 F.Supp.2d 579, 586 & n. 10 (E.D.Va. 2004) (citing Patterson, 487 U.S. at 296 & Moran v. Burbine, 475 U.S. 412, 421 (1986)).

Furthermore, although Miranda's suppression rule applies only to custodial interrogations, Supreme Court and Fourth Circuit authority make clear that the Fifth Amendment's guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself" prevents the admissibility of non-voluntary statements made by criminal suspect, irrespective of whether the statement was made while the suspect was in custody.  See, e.g., Beckwith v. United States, 425 U.S. 341, 346 (1976); United States v. Braxton, 112 F.3d 777, 783 (4th Cir. 1997).  In determining whether a statement was voluntarily made, a court is to consider any evidence of threats, violence, promises or other "coercive"police activity with the ultimate question being one of whether the suspect's "will has been overborne or his capacity for self-determination critically impaired." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).  Statements freely and voluntarily made must not be suppressed.  Id. (citing Miranda, 384 U.S. at 478).

The Court of Appeals of Virginia summarized the evidence relating to petitioner's post-arrest statements as follows:

> [Petitioner] was taken into custody around 2:30 [P.M.] [] and transported to the Norfolk Police Operations Center (POC). At around 5:22 [P.M.] that day, Detective ... Balen came into contact with [petitioner] at the POC. Balen took [petitioner] from his lock-up cell to the restroom. Balen then placed [petitioner] back in his cell and again had contact with him around 7:15 [P.M.]. At that time, [petitioner] was removed from the lock-up cell and placed in an interview room. The interview room

measured eight feet by eight feet, and contained a table, three chairs, and one door with a window. [Officer] Donnelly, who was also in the interview room, told [petitioner] he was under arrest for the robbery of the Bank of America based upon positive witness identifications. At 7:17 [P.M.], Donnelly offered [petitioner] some water and a cigarette. Prior to speaking to [petitioner], Balen and Donnelly advised [petitioner] of his <u>Miranda</u> rights. First, they established that [petitioner] could read and write, and then [petitioner] reviewed the Norfolk Police Department Legal Rights Advice Form .... [Petitioner] wrote the word "yes" and his initials or name next to each line indicating that he understood each of his wrights and signed his name at the bottom of the form at 7:28 [P.M.]. [Petitioner] indicated on the form that his rights had been fully explained to him and he understood them, but that he wished to waive those rights and make a statement. He also indicated on the form that "[t]his statement is completely free and voluntary on my part without any threat or promise from anyone."

Donnelly and Balen explained to [petitioner] that they were investigating some robberies. First, [petitioner] gave an oral statement, which began at approximately 7:30 [P.M.]. That statement was subsequently reduced to writing, producing two separate written statements. In the first written statement, ... [petitioner] admitted to his participation in the November 4, 2002 Bank of America robbery. [Petitioner] reviewed that statement after he made it and was given the opportunity to make any changes, corrections, or deletions he felt were necessary. [Petitioner] initialed that statement at the top and bottom of each page, and signed it .... In the second statement, ... [petitioner] admitted to his participation in the December 4, 2002 conspiracy to commit bank robbery at the Bank of Hampton Roads. That statement contained certain answers in [petitioner's] handwriting. [Petitioner] also reviewed that statement and was given the opportunity to make any changes, corrections, or deletions he felt were necessary. [Petitioner] also initialed the top and bottom of each page of the second statement, and signed that statement at 9:01 [P.M.]. At around 9:33 [P.M.], the police provided [petitioner] with pizza, which he ate in the interview room.

Balen testified that during the entire course of his interaction with [petitioner] from 7:15 [P.M.] to 8:59 [P.M.], [petitioner], who was nineteen years old at the time and indicated that he had graduated from high school, appeared concerned, attentive, and lucid. [Petitioner] did not appear to be under the influence of alcohol or narcotics. [Petitioner] appeared to understand the detectives' questions. [Petitioner] never requested an attorney nor did he ever ask to make a telephone call to an attorney or to his family. [Petitioner] never stated that he wanted to stop speaking to the detectives and never gave any indication that he no longer wanted to cooperate with them.... Balen and Donnelly were not armed with guns while interviewing [petitioner]. At no point in the interview [] did Balen or Donnelly promise [petitioner] leniency in exchange for his statements or make any promises to him.

After 9:00 [P.M.] that night, Balen also spoke to [petitioner] about another robbery, but did not take a written statement from him. [Petitioner did not ask for a lawyer during that discussion or to make a phone call. [Petitioner] also spoke with detectives from other jurisdictions about robberies in those jurisdictions.  At 9:02 [P.M.], [detective] McMorris interviewed [petitioner] about the Motel 6 robbery and took a written statement in which [petitioner] admitted his participation in that robbery.... [Petitioner] initialed and signed that statement and was given the opportunity to review it and make any necessary changes, corrections, or deletions. [Petitioner] did not appear intoxicated. [Petitioner] never requested an attorney, never asked to telephone an attorney, and never indicated that he did not wish to speak with McMorris.  McMorris made no promises to [petitioner] in exchange for his statement.

...

Petitioner admitted that ... the Norfolk police transported him to the POC.  Once there, [petitioner] was placed in a holding cell. [Petitioner] claimed that about five armed detectives, including Donnelly, came back about five minutes later and ordered him to remove his pants so they could see if he had a certain mark on his body. [Petitioner] testified that he asked for a lawyer at that point, and they told him he did not "need a lawyer for what we are trying to do right now." After [petitioner] complied, the detectives placed him back in the holding cell. [Petitioner] claimed he was in the holding cell for four to six hours before the police came back and took him out. [Petitioner] denied that he was ever advised of his Miranda rights before the police removed him from the holding cell the second time. [Petitioner] contended that without advising him of his Miranda rights, the detectives began questioning him in a hallway before taking him to the interview room. [Petitioner] claimed that he asked to call his mother, but they did not allow him to do so. [Petitioner] claimed that he asked for a lawyer two times before the detectives placed him in the interview room. [Petitioner] denied ever being given a bathroom break while he was in the holding cell or being asked if he wanted anything to eat. [Petitioner] claimed that after about twenty minutes of questioning in the hallway, the detectives took him to an interview room.

[Petitioner] claimed that once in the interview room, Donnelly and Balen threatened him with life in prison and asked him to give them information on other crimes. [Petitioner] claimed the detectives told him they would talk to the Commonwealth's Attorney [] if [petitioner] cooperated with them. [Petitioner] claimed the two detectives were "talking real nasty and harsh" and were "in [his] face," causing him to feel threatened and scared. [Petitioner] claimed he would have never given his statements if the police had not threatened him and made promises to him.  He denied ever being advised of his Miranda rights before 7:28 [P.M.], even though the police had already begun questioning him outside his holding cell. He also claimed that McMorris later told him "if you will admit to all of this, we will drop this other

21

robbery and drop this grand larceny, and stuff like that" with respect to the Motel 6 robbery.

On cross-examination, [petitioner] .... admitted that Donnelly and Balen reviewed the PD-381 Legal Rights Advice Form with him at 7:00 [P.M.] when they brought him into the interview room, but he claimed that detectives spoke to him before he ever signed that document. [Petitioner] admitted that his written statements were given after the rights form was signed by him. [Petitioner] claimed that when he was placed in the interview room he "asked to make a phone call to call my parents and call the lawyer." [Petitioner] admitted that once in the interview room, the detectives explained to him the evidence they had against him on the robberies and why he was there. [Petitioner] admitted that the detectives told him that robbery carried five to life as punishment. [Petitioner] claimed that Donnelly had a gun on his person when he questioned [petitioner] in the interview room. [Petitioner] denied being handcuffed[, and h]e also denied being given a cigarette, water, or pizza to eat. [Petitioner] denied reading over his statements, but said he just did what the detectives told him to do when he put his initials on the statements. [Petitioner] admitted that after he spoke to the three Norfolk detectives, he spoke with investigators from Chesapeake, Hampton, and Virginia Beach. He admitted that he gave statements to those detectives, but claimed he did not do so willingly.

On redirect, .... [petitioner] stated that he felt he had to do whatever the detectives wanted him to do in order to go home. He claimed the detectives told him to write and he complied.

Donnelly testified that neither he nor Balen had guns on them when they were in the interview room with [petitioner], pursuant to POC policy. Donnelly also denied telling [petitioner] to pull his pants down in the holding area. Donnelly denied ever being with four to five other detectives at any point in time carrying guns and dealing with [petitioner] near the holding area. Donnelly denied that [petitioner] ever asked for a lawyer while near the holding area or while in the interview room. Donnelly denied that he or any other detective in his presence told [petitioner] that he could go home if he confessed to certain robberies. Donnelly denied that [petitioner] was promised anything in exchange for his statements. Donnely denied ever questioning [petitioner] about the robberies before advising him of his <u>Miranda</u> rights.

<u>Vines</u>, R. No. 2691-04-1, slip op. at 3-7. Rejecting petitioner's challenge the voluntariness of his

statements to police, the Court of Appeals of Virginia stated:

With respect to the voluntariness of [petitioner's] statements, the trial court ruled that there was no credible evidence establishing that [petitioner's] will was overborne by the detectives. The trial judge noted that based upon the detectives' testimony it was clear that they followed proper procedures for questioning an individual such as

[petitioner].  The trial court rejected [petitioner's] testimony and accepted the detectives' testimony.  In doing so, the trial judge noted that [petitioner] impressed him as a person who is "manipulative" and a "calculating liar."  The trial judge noted, "[petitioner's] credibility is simply, as they say, a no-brainer.  He is not telling the truth, and I think everyone in this room knows it, including himself.  In fact, he lies so strongly that I wonder whether or not perjury indictments ought not to be brought."

...

Detectives Donnelly and Balen testified that they advised [petitioner] of his <u>Miranda</u> rights before questioning him.  After advising him of those rights, [petitioner] completed a rights waiver form.  [Petitioner] marked the form indicating that he understood each of his rights as the detectives advised him of them individually.  [Petitioner], who was nineteen years old at the time, confirmed that he was a high school graduate and had planned to attend college.  He confirmed that he could read and write.  [Petitioner] agreed to waive his rights and speak with the detectives.  According to the detectives, [petitioner] never requested a lawyer[,] never requested to call his parents[, and] never indicated that he did not want to talk with the detectives.  In addition, the detectives provided [petitioner] with a bathroom break, a cigarette, water, and food.  The detectives denied making any promises to [petitioner] in exchange for his statements and denied they threatened him.  McMorris testified that [petitioner's] demeanor was very relaxed and calm when he spoke to McMorris, and that [petitioner] did not appear intoxicated.  [Petitioner] never requested an attorney, never asked to telephone an attorney, and never indicated that he did not wish to speak with McMorris.  McMorris made no promises to [petitioner] in exchange for his statement.

The trial judge accepted the detectives' testimony and specifically rejected [petitioner's] testimony, labeling him a "calculating liar."  Based on the totality of the circumstance surrounding the interrogations as reflected in the detectives' testimony, we conclude that [petitioner's] will was not overborne, his capacity for self-determination was not critically impaired, and his statements were the product of an essentially free and unconstrained choice, and not the product of coercive police misconduct.  Accordingly, his statements were freely, voluntarily, and intelligently given.

For these reasons, the trial court did not err in denying [petitioner's] motion to suppress.

<u>Id.</u> at 8 , 11-12. The reasoning of the Court of Appeals of Virginia is imputed to the Supreme Court

of Virginia, which refused the petition for appeal without explanation. <u>See</u> <u>Ylst</u>, 501 U.S. at 803.

Claim 3(b) fails because Vines has not established the requisite level of coercive activity to

show that his confession was not knowing and voluntary.  As an initial matter, Vines' mere allegation that police did not provide him with <u>Miranda</u> warnings prior to his confession is insufficient to overcome the state court's finding that the detectives provided petitioner such warnings before questioning him.  <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Miller-Ell</u>, 545 U.S. at 240.  In light of this finding, the Court must then focus on whether Vines understood his <u>Miranda</u> rights, the consequences of waiver of those rights, and whether he was forced, threatened or coerced in any way.  Although Vines asserts that he had no prior experience with the judicial system and felt scared in the interview room, he has not shown that those circumstances interfered with his ability  to understand and waive his rights under <u>Miranda</u>.  Moreover, petitioner's memoranda in support of his federal habeas petition merely repeats arguments presented to and ultimately rejected by the Court of Appeals of Virginia.  But these arguments do not demonstrate that Vines was forced, threatened or coerced in any way to waive his <u>Miranda</u> protections and give his statements to detectives.  Finally, and most importantly for purposes of claim 3(b), Vines has not established that the confessions he did give to detectives, irrespective of any <u>Miranda</u> warnings given, were involuntarily made.  Although Vines appears to reiterate the argument he made on the direct appeal that detectives were "in his face" and made promises to and threatened him, his arguments to this effect are insufficient to overcome the state court's finding that the detective made no such promises or threats.  As petitioner has failed to demonstrate that the rejection of his involuntariness claim was contrary to, or an unreasonable application, clearly established federal law or based on an unreasonable determination of the facts, claim 3(b) will be dismissed.

**V.**

For the foregoing reasons, respondent's Motion to Dismiss the petition will be granted and the instant petition for a writ of habeas corpus will be dismissed with prejudice.  An appropriate Order shall issue.

Entered this ___5th___ day of ___August___ 2008.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

25